**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Reed Day and Albert Jacobs,

              Plaintiffs,

v.

Ben Henry, et al.,

              Defendants,

and

Wine and Spirits Wholesalers Association
of Arizona,

              Intervenor-Defendant.

No. CV-21-01332-PHX-GMS

**ORDER**

Before the Court are three motions for summary judgment: Plaintiffs Reed Day and Albert Jacobs' ("Plaintiffs") Motion for Summary Judgment (Doc. 38), Defendants Ben Henry, Troy Campbell, and Kris Mayes in their official capacities ("State Defendants") Motion for Summary Judgment (Doc. 43), and Defendant Wine and Spirits Wholesalers Association of Arizona's ("Intervenor-Defendant") Motion for Summary Judgment (Doc. 46). For the following reasons, State-Defendants' and Intervenor-Defendant's motions for summary judgment are granted and Plaintiffs' Motion for Summary Judgment is denied.

1

## BACKGROUND

2       Plaintiffs challenge aspects of Arizona's wine regulation scheme as violations of the

3  dormant Commerce Clause.

4       Arizona uses a system to regulate alcohol sales and distribution known as a "three-

5  tier" system.  In a three-tier system, there are three distinct types of licensees that the state

6  regulates: producers, wholesalers, and retailers.  This system requires, as the Arizona State

7  Legislature has said, "a separation between manufacturing interests, wholesale interests

8  and retail interests in the production and distribution of spirituous liquor in order to prevent

9  suppliers from dominating local markets through vertical integration and to prevent

10 excessive sales of spirituous liquor produced by overly aggressive marketing techniques."

11 1991 Ariz. Sess. Laws, Ch. 52, § 1.

12      As Arizona's system is currently structured, wine imported into the State typically

13 must pass through Arizona wholesalers before reaching retailers, and ultimately

14 consumers.   Those wholesalers are subject to a number of regulations, including a

15 requirement to hold alcohol for 24-hours before selling to retailers, periodic inspections,

16 and excise taxes.  Wholesalers must buy spirituous liquor directly from a licensed supplier

17 who is the primary source of supply for the brand, i.e., the producers.  Wholesalers then

18 sell to licensed retailers.  The licensed retailers must have a physical premise in Arizona

19 and must order, purchase, or receive all of their wines from Arizona licensed wholesalers,

20 registered retail agents, or, in limited circumstances, Arizona farm wineries.  Retailers may

21 ship wine to consumers directly from their physical premises and their physical premises

22 are subject to inspection by state officials.

23      Because a retailer must have a physical premise in the state to be licensed, and the

24 products must be purchased from a producer by an Arizona wholesaler which must hold

25 the alcohol for 24-hours before selling to an Arizona retailer, an out-of-state retailer may

26 not ship directly to consumers.  An exception exists for in-state and out-of-state wineries,

27 which may apply for and receive a license to sell and ship limited quantities of the wines

28 that they produce directly to consumers.  A.R.S. § 4-203.04.

1    The only remaining Plaintiffs in this suit are two individuals who describe
2   themselves as "avid wine drinker[s] and collector[s]" that reside in Arizona.  (Doc. 1
3   ¶¶ 3-4.)  They assert that because in-state wine retailers can provide wine directly to
4   consumers by online orders due to their physical presence in Arizona, but out-of-state wine
5   retailers cannot unless they obtain such a presence and otherwise comply, Arizona law
6   violates the dormant Commerce Clause.  They ask the Court to enjoin or modify the laws
7   establishing this framework to require that out-of-state retailers be permitted to sell directly
8   to Arizona consumers.

9                                         **DISCUSSION**

10    An initial challenge with assessing Plaintiffs' claims is that they do not clearly
11   identify the precise laws or regulations that they challenge in this lawsuit.  The Court is not
12   certain whether Plaintiffs challenge one law or regulation or many.  In their Motion for
13   Summary Judgment, Plaintiffs cite several statutes and regulations under "The Law Being
14   Challenged" (Doc. 38 at 4), nevertheless, they cite only one provision that they seek to
15   enjoin (or, more accurately, modify) in the "Remedy" section (Doc. 38 at 15).  They ask
16   the Court to enjoin the law that requires:

17                  [a]ll spirituous liquor shipped into this state shall be invoiced
18                  to the wholesaler by the primary source of supply.   All
19                  spirituous liquor shall be unloaded and remain at the
20                  wholesaler's premises for at least twenty-four hours.  A copy
21                  of each invoice shall be transmitted by the wholesaler and the
22                  primary source of supply to the department of revenue.

23   A.R.S. § 4-243.01(B).  Plaintiffs add that when enjoining this provision, the Court should
24   "clearly limit the injunction to allow direct shipping by out-of-state retailers, while leaving
25   intact the State's ability to enforce other aspects of its permit requirement."  (Doc. 38 at
26   16.)  In response to the Defendants' motions for summary judgment and at oral argument,
27   however, Plaintiffs stated that they challenged only the requirement that retailers must have
28   physical premises in the state in order to directly ship to consumers.

1    Ultimately, the outcome Plaintiffs hope for—the ability for out-of-state retailers to

2    ship wine to consumers in Arizona—is clear.  It does not seem, however, that the Court

3    could accomplish this objective by enjoining any single statute or regulation alone.

4    Regardless of whether the Plaintiffs wish the Court to re-work only one statute of the

5    regulatory program, or make a more comprehensive adjustment, their claims do not survive

6    summary judgment.

7    **I.      Standing**

8    Article III standing is a threshold jurisdictional question.  *Steel Co. v. Citizens for a*

9    *Better Env't*, 523 U.S. 83, 102 (1998).  The "irreducible constitutional minimum of

10   standing" has three requirements.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

11   First, Plaintiffs must demonstrate an injury in fact, a "harm suffered by the plaintiff that is

12   concrete and actual or imminent."  *Steel Co.*, 523 U.S. at 103 (internal quotations omitted).

13   Second, Plaintiffs must show causation—"a fairly traceable connection between the

14   plaintiff's injury and the complained-of conduct of the defendant."  *Id.*  "And third, there

15   must be redressability—a likelihood that the requested relief will redress the alleged

16   injury."  *Id.*  "The burden of establishing these three elements falls upon the party asserting

17   federal jurisdiction."  *Cent. Data Water Agency v. United States*, 306 F.3d 938, 947 (9th

18   Cir. 2002).  "[A]t the summary judgment stage the plaintiffs need not establish that they in

19   fact have standing, but only that there is a genuine question of material fact as to the

20   standing elements."  *Id.*

21   In this case, neither party appears to dispute that an injury exists, and other courts

22   have held that in-state residents can properly show an injury when state law prevents them

23   from purchasing wines not available in that state.  *Sarasota Wine Mkt., LLC v. Schmitt*, 987

24   F.3d 1171, 1178 (8th Cir. 2021) ("[Individual plaintiffs] cannot afford the time and expense

25   of traveling to out-of-state retailers to purchase a few bottles of rare wine and personally

26   transport them home.  This is alleged economic injury, whatever one might think of the

27   severity of the injury." (internal quotations omitted)).

28   Whether Plaintiffs sufficiently show Article III standing is at least doubtful,

- 4 -

however, because it is difficult to see how their claims are redressable for two reasons. First, because it is unclear which provisions Plaintiffs actually challenge, it is likely that unchallenged provisions may prevent them from obtaining the relief they seek.   And second, if Plaintiffs challenge (albeit, without identifying) all the laws that preclude them from obtaining wine from some out-of-state retailers, it is not clear that the Court could, or in any event, would grant the relief that Plaintiffs request.

*Unchallenged Provisions*:  Arizona's three-tier system for regulating alcohol arises out of many statutes working in concert.  The inability for retailers to ship directly to consumers from out of state is a byproduct of the statutes creating the system under which alcohol must move from a producer to a licensed Arizona wholesaler to a licensed Arizona retailer before sale to a consumer.  Different statutes establish each of these requirements. *See* A.R.S. § 4-203.04; A.R.S. § 4-243.01; A.R.S. § 4-244(1); A.R.S. § 4-201(A)-(D).

If Plaintiffs challenge any of these statutes individually, it is unlikely that a finding in their favor would redress their injury because other statutes would continue to prevent shipping to consumers from out of state.  For example, Plaintiffs assert that the Court should enjoin A.R.S. § 4-243.01(B)—the requirement that alcohol be shipped to an Arizona wholesaler and remain with the wholesaler for at least 24 hours—in a manner that makes it possible for out-of-state retailers to directly ship to consumers.  But such a remedy would not solve the Plaintiffs' problem because other statutes still impede Plaintiffs' proposed outcome.  The preceding statutory subsection states that it is unlawful for a retailer to order, purchase or receive any spirituous liquor from any source other than an Arizona-licensed wholesaler.  A.R.S. § 4-243.01(A)(3).  There is no evidence suggesting that the rare wines Plaintiffs seek to order online would be or could be purchased from Arizona wholesalers by out-of-state retailers. *See Orion Wine Imports, LLC v. Appelsmith*, 837 F. App'x 585, 586 (9th Cir. 2021) ("[G]iven that other provisions of the [liquor laws] that Plaintiffs do not challenge would inflict the same injury by barring the proposed transaction, . . . the connection between Plaintiffs' alleged injury and the challenged provision . . . is too attenuated for Article III standing.").

In response, Plaintiffs instead state that they "challenge Arizona's requirement that wine retailers must be physically located in the state to ship directly to consumers." (Doc. 48 at 11.)   Although Plaintiffs do not cite a law or laws for this proposition, State Defendants characterize this challenge as a challenge to A.R.S. § 4-203(J), which requires that licensed retailers ship alcohol directly to consumers only from the (in-state) premises associated with their retail license.   This statute still raises the same concern with redressability.   Even if the Court enjoined the requirement that alcohol be shipped only from in-state retail premises, out of state retailers would still be unable to comply with other statutory requirements, including the requirement that the wine be shipped first to an Arizona wholesaler, then held for twenty-four hours, then shipped to an Arizona retailer.

*Leveling-Down Remedy:* To the extent Plaintiffs argue that they seek a remedy that enjoins or modifies all laws impeding the direct shipment of wine from out-of-state retailers, it may solve the unchallenged provisions problem, but it creates a new redressability problem.   It is unclear that the Court could or would grant such a remedy when narrower remedies are available; in other words, the Court would likely "level down" in regulation rather than "leveling up."

The Supreme Court has explained that remedies for unconstitutional statutes should be limited to the problem, enjoining "only the statute's unconstitutional applications while leaving the others in force . . . or . . . sever[ing] its problematic portions while leaving the remainder intact."   *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 321 (2006).   The Court has provided three general principles for remedies when "confronting a statute's constitutional flaw": (1) "the Court tries not to nullify more of a legislature's work than is necessary;" (2) "the Court restrains itself from rewriting state law to conform it to constitutional requirements;" and (3) "the touchstone for any decision about remedy is legislative intent."   *Id.* (internal quotations omitted).

Here, even if this Court found a constitutional violation in how the statutes work together to prevent online sales and direct shipping from out-of-state retailers to consumers, any constitutional defect could be cured in different ways—some of which might grant

1    Plaintiffs relief, and others of which would not.  Plaintiffs identify a number of statutes and
2    regulations which would, apparently, have to be rewritten to provide them relief.  Plaintiffs'
3    requested relief would require complete exemption from the three-tier system for out-of-
4    state retailers or would require the Court to rewrite the licensing and regulatory scheme to
5    enable out-of-state retailers to obtain a license.  Both options are likely beyond the
6    Legislature's intent and the Court's "constitutional mandate and institutional competence."
7    *Ayotte*, 546 U.S. at 329.

8        Because "the touchstone for any decision about remedy is legislative intent," and
9    "the Court tries not to nullify more of a legislature's work than is necessary," this Court
10   could create a restrictive, rather than expansive, remedy for a constitutional violation.  *See*
11   *Ayotte*, 546 U.S. at 321.  The Legislature might well prefer this method of curing any
12   potential constitutional infirmity.  Under such a scenario, the remedy would be to enjoin
13   online sales and shipping by in-state retailers.  This more limited remedy would leave the
14   three-tier system largely intact while eliminating the allegedly unconstitutional disparity
15   between out-of-state and in-state retailers' abilities to directly ship to consumers.  This
16   remedy would not, however, provide these Plaintiffs with the relief that they request—
17   access to direct shipment of out-of-state retailers' wines.  If the remedy would affect
18   Plaintiffs' abilities to access a wider variety of wines at all, it would likely restrict, rather
19   than enlarge the variety to which they have access by preventing in-state retailers from
20   shipping directly to their homes.  Such a result cannot be reasonably seen as redressing
21   Plaintiffs' injuries.

22       However, the redressability inquiry appears to depend on what relief the Court *could*
23   conceivably grant, rather than the relief it should or would grant.  The Ninth Circuit has
24   framed this inquiry as whether the plaintiffs can show that the relief they seek is "within
25   the district court's power to award."  *Juliana v. United States*, 947 F.3d 1159, 1170 (9th
26   Cir. 2020).  In *Juliana*, for example, the Ninth Circuit held that plaintiffs had no standing
27   to bring a claim for a declaratory and injunctive relief ordering the government to
28   implement a plan to phase out fossil fuel emissions.  *Id.* at 1165.  The Court found that the

plaintiffs' injuries were not redressable because a declaratory judgment or injunction aimed solely at government activity would be insufficient to provide them relief because a declaratory judgment alone would not "suffice to stop catastrophic climate change." *Id.* at 1170. The Court would have to "order, design, supervise, or implement the plaintiffs' requested remedial plan." *Id.* at 1171. Such a remedy is, according to the Ninth Circuit, "beyond the power of an Article III court." *Id.*

In this case, for the reasons noted above, the Court doubts the extent to which it could properly navigate implementing Plaintiffs' proposed remedies, such as enjoining several statutes not identified, rewriting the regulations to create a licensing scheme, or as proposed at oral argument, commanding the legislature to rewrite the statutes within a particular timeframe. Nevertheless, even assuming the Plaintiffs do have standing because the Court could conceivably provide a remedy that would redress the Plaintiffs' alleged injury, Plaintiffs' claims fail on the merits.

## II.    Motions for Summary Judgment

### A.  Legal Standard

The parties dispute, to some degree, the relevant standard for a dormant Commerce Clause challenge involving the Twenty-First Amendment. The parties agree, and the Supreme Court's recent case *Tennessee Wine* indicates, that the first step of the inquiry is whether the challenged regulation discriminates against out-of-state economic interests. 139 S. Ct. 2449, 2461 (2019). If the regulation is not discriminatory, there is no dormant Commerce Clause violation. If the regulation is discriminatory, the next step is to examine the law's relation to its purpose. Here, the parties disagree on the standard at the second step.

Plaintiffs advocate for essentially a strict scrutiny standard, contending that the Court should assess whether the law "is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine*, 139 S. Ct. at 2461. Defendants point to a different standard from *Tennessee Wine*, under which the Court evaluates "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate

nonprotectionist ground." *Id.* at 2474.  None of the circuit courts that have addressed challenges like this one after *Tennessee Wine* have held that a strict scrutiny standard is appropriate; they have all endorsed the lesser standard assessing whether the requirement is justified as a public health or safety measure or on some other legitimate nonprotectionist ground. *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 871 (6th Cir. 2020); *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 220 (4th Cir. 2022); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d at 1183-84.  Moreover, in *Tennessee Wine*, the reference to the strict scrutiny standard is in a general discussion of the Court's dormant Commerce Clause cases, while the Court actually applies the lesser standard when analyzing the discriminatory laws at issue.  *Id.* ("Recognizing that § 2 was adopted to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens, we ask whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground.").  This demonstrates that strict scrutiny is not appropriate, and the Court will apply the standard adopted by the Supreme Court.

### B.  Whether the Laws Are Discriminatory

The laws that Plaintiffs challenge are not facially discriminatory, nor are they discriminatory in effect because they apply evenhandedly.  Plaintiffs concede that the prohibition on out-of-state retailers from shipping wine directly to consumers "is not written down explicitly in a statute but is deduced from numerous statutes."  (Doc. 38 at 4.)  Plaintiffs' claim, at its core, challenges the requirement that a retailer have in-state premises in order to obtain a license and must ship wine from those premises.  In Plaintiffs' words, they only "challenge Arizona's requirement that wine retailers must be physically located in the state to ship directly to consumers."  (Doc. 48 at 11.)

The first question then is whether the challenged regulation discriminates against out of state interests.  The Supreme Court defines impermissible discrimination under the dormant Commerce Clause as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Granholm v. Heald*, 544 U.S.

460, 472 (2005).  And the Ninth Circuit has emphasized that "the 'differential treatment' must be as between persons or entities who are similarly situated."  *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010).

### 1.  Similarly Situated

The premises requirement does not discriminate against similarly situated out-of-state entities.  It is not clear that Plaintiffs argue that the regulations are facially discriminatory.  Because they say that the ban is "not written down explicitly," it appears that they argue the regulations have a discriminatory effect.  To that end, Plaintiffs state that they challenge the fact that "there is no permit available for out-of-state retailers that would allow delivery from their out-of-state premises directly to consumers located in Arizona." (Doc. 48 at 10.)  They contrast this with the fact that properly licensed in-state retailers may take online orders from consumers and ship from their licensed retail premises to the consumer's address in Arizona.  However, the fact that unlicensed retailers cannot ship to consumers from out of state and licensed retailers can ship to consumers from in state is a feature of the liquor regulation system in Arizona, not a flaw.  The fact that licensed entities have privileges that unlicensed entities do not is the very purpose of a licensing scheme; a party must comply with the burden of getting a license to obtain the benefits of having a license.

Retailers with physical premises in Arizona are subject to Arizona's specific three-tier system and regulations.  These include, but are not limited to, on-site liquor inspections, investigation of complaints, covert underage buyer programs, audits and other financial inspections, and investigation of records to determine compliance with Arizona liquor laws. (Doc. 44 at 3-5.)  Out-of-state retailers without a physical premise in Arizona are not subject to any of the regulations that apply to Arizona's retailers, and they are not required to obtain alcohol from Arizona wholesalers or wholesalers under Arizona's oversight and regulation.

It is doubtful that retailers subject to all of Arizona's liquor regulations and retailers subject to none of them can be seen as similarly situated.  Other courts have recognized

that when granting plaintiffs' requested relief would allow the out-of-state entity "dramatically greater rights" than the in-state entity, they are likely not similarly situated. *See Wine Country Gift Bakets.com v. Steen*, 612 F.3d 809, 820 (5th Cir. 2010); *cf. Lebamoff*, 956 F.3d at 873 ("[Licensed] retailers all live with the bitter and sweet of Michigan's three-tier system . . . [Plaintiff] seizes the sweet and wants to take a pass on the bitter."). Here, Plaintiffs request just that. They ask for in-state retailers to remain subject to the state's three-tier system, while exempting out-of-state retailers from the requirements. An outcome that would result in such broad disparities between the regulations to which the entities are subject demonstrates that they are not similarly situated.

Any suggestion that *Granholm v. Heald* forecloses this determination fails to recognize that the *Granholm* case addressed a discriminatory exception to the three-tier system, and an exception involving an entirely different tier—producers. In *Granholm*, Plaintiffs challenged Michigan's liquor laws which allowed in-state wineries (producers) to bypass the wholesaler tier and ship directly to consumers, while banning out-of-state wineries from shipping to Michigan consumers. 544 U.S. at 469. Plaintiffs also challenged New York's laws which allowed only local wineries or out-of-state wineries using at least seventy-five percent New York grapes to ship directly to consumers. *Id.* at 470. In that case, in-state wineries were permitted to ship directly to consumers, thus bypassing the wholesaler tier in the system. Out-of-state wineries were not afforded the same exception.

Importantly, the wine that in-state producers were shipping to consumers did not have to go through the state's three-tier system in that case. Therefore, wine made by out-of-state producers, also having not been funneled through the state's three-tier system, can be seen as similarly situated. The Supreme Court stated that the requirements imposed on out-of-state producers was "just an indirect way of subjecting out-of-state wineries, but not local ones, to the three-tier system." *Id.* at 474. *Granholm* thus requires only that an exemption from the three-tier system granted to in-state producers must also be granted to out-of-state producers, because none of them will have been funneled through the three-

tier system.  Plaintiffs in this case ask for the reverse; they ask that in-state retailers be subject to the three-tier system, while out-of-state retailers be exempt.  *Granholm* does not require such a result.

### 2. Evenhanded Application

Moreover, Arizona's physical premises requirement applies evenhandedly to in-state and out-of-state retailers.  To start, the physical premises requirement does not outright prevent an out-of-state retailer from obtaining a license.  Indeed, as Plaintiffs concede, several have.  (Doc. 44 at 6; Doc. 50 at 10 (noting that several large out-of-state companies such as Walmart, Sam's Club, and Total Wine have retail licenses and operate retail premises in Arizona, despite being headquartered elsewhere)).  Despite the fact that some out-of-state retailers have obtained licenses and may sell and ship wine to Arizona consumers, Plaintiffs contend that some out-of-state retailers may find it onerous to comply or not want to comply with the premises requirement, thus making the requirement discriminatory.

The Second Circuit has held that a nearly identical challenge did not violate the dormant Commerce Clause because New York's "laws evenhandedly regulate the importation and distribution within the state." *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 191 (2d Cir. 2009).  It emphasized that while creating specific exceptions to the three-tier system applicable only to in-state producers was discriminatory and protectionist, merely requiring that "all liquor—whether originating in state or out of state—pass through the three-tier system," is not.  *Id.*  The same is true in this case.

*Tennessee Wine* demonstrates how a premises requirement is not discriminatory as compared to a durational residency requirement.  In that case, Plaintiffs challenged Tennessee's requirement that to obtain a license to sell alcohol, an individual corporation must demonstrate that they have been a bona fide resident of the state for at least two years.  139 S. Ct. at 2454.  There, unlike here, the prerequisites to obtaining a license plainly favored in-state residents.  If one was not an in-state resident, she had to change her residency and wait until two years passed to obtain a license.  Here, no such prerequisite

favoring in-state residents exists.  Instead, if an out-of-state company wants to obtain a license to sell wine to consumers, it must comply with the same requirements as companies located in the state, and establish a physical premise in Arizona, from which it will receive, sell, and ship its wine.  Likewise, if an in-state company does not have physical retail premises in the state, it may not obtain a license to sell or ship wine to consumers in the state.

Multiple circuit courts have reaffirmed this position after *Tennessee Wine*.  In *Sarasota Wine Market*, the Eighth Circuit held that Missouri's licensing requirements, which are substantially similar to the ones at issue here, did not violate the dormant Commerce Clause.  987 F.3d at 1184.  It explained that because the state "imposes the same licensing requirements on in-state and out-of-state retailers," it does not discriminate against out of state retailers or wholesalers.  *Id.*  The Court noted that in *Tennessee Wine*, the Supreme Court "expressly distinguished between the two-year residency requirement at issue and a State's requirement that retail liquor stores be physically located in the state." *Id.* at 1183.  And despite recognizing that the requirements for licensure "are likely to impose greater costs than would otherwise be incurred by an out-of-state retailer selling to Missouri consumers," it found no dormant Commerce Clause violation because "the rules governing direct shipments of wine to Missouri consumers apply evenhandedly to all who qualify for a Missouri retailers license."  *Id.* at 1183-84; *see also Lebamoff*, 956 F.3d at 875-76 ("Residents of Indiana are on 'the same footing' as residents of Michigan.  To sell alcohol in Michigan, they simply have to play by the Michigan rules—just as they have to do in Indiana.  So far, over 1,800 non-residents have gotten Michigan retail licenses. [Plaintiff] can do the same.").

Here, too, there is no discriminatory advantage or exception offered to Arizona corporations.  Therefore, Arizona's system does not discriminate against out-of-state interests and thus does not run afoul the dormant Commerce Clause.

### C.  Legitimate State Interests

However, even if the requirement to establish a physical retail premise in Arizona

to obtain a license is discriminatory, the premises requirement is such an essential feature of the three-tier system that it is supported by legitimate, nonprotectionist state interests. For this inquiry, the question is "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Tenn. Wine*, 139 S. Ct. at 2474. Several courts before and after *Tennessee Wine* have recognized the legitimacy of a state's interest in preserving the three-tier system, which is what Arizona's premises requirement does.

The state offers several reasons for wanting to maintain its three-tier system and prevent direct shipping from unlicensed, out-of-state retailers. These include: (1) the regulation of the quantity of alcohol; (2) regulation of the quality of alcohol; (3) the state's interest in protecting minors; and (4) the state's interest in revenue. For example, the State explains that on-site routine inspections are used to ensure compliance with the law, which Plaintiffs do not dispute. The State also explains that it routinely inspects the records of Arizona licensed wholesalers to determine if a retailer is in compliance with liquor laws and is purchasing from an appropriate source.

In response, Plaintiffs primarily allege that the State's interests are not legitimate because some other states successfully allow out-of-state retail shipping. Plaintiffs acknowledge that unlicensed and unregulated alcohol sales could pose a threat to public health and safety but appear to argue that the premises requirement is insufficiently related to those purposes because other states can and do allow direct shipping. (Doc. 56 at 9.) This argument misses the fact that "[t]he aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use." *Granholm*, 544 U.S. at 484. A determination that the State forfeited its interest in maintaining its three-tier system merely because other states have abandoned aspects of the system or allowed for direct shipping would be inconsistent with each state's ability to regulate alcohol within its borders.

At least three other circuits since *Tennessee Wine* have reaffirmed that requiring physical premises in state is a fundamental aspect of the three-tier system and serves the

state's legitimate interests in maintaining that system.  *See, e.g.*, *Lebamoff*, 956 F.3d at 873 ("Michigan could not maintain a three-tier system, and the public-health interests the system promotes, without barring direct deliveries from outside its borders."); *Sarasota Wine Mkt.*, 987 F.3d at 1183; *B-21 Wines*, 36 F.4th at 229 (concluding that North Carolina's Retail Wine Importation Bar is "justified on the legitimate nonprotectionist ground of preserving North Carolina's three-tier system").  Here, the state has asserted the same interest in preserving its three-tier system, which has been upheld as "unquestionably legitimate."  *Granholm*, 544 U.S. at 489.  As several cases addressing the same issue explain, "there is nothing unusual about the three-tier system, about prohibiting direct deliveries from out of state to avoid it, or about allowing in-state retailers to deliver alcohol within the state."  *Lebamoff*, 956 F.3d at 872.  To open the state up to direct deliveries from retailers without physical premises in the state would "effectively eliminate the role of [Arizona's] wholesalers" and "create a sizeable hole in the three-tier system."  *Id.*

In arguing that the state's interests are not legitimate, Plaintiffs focus almost exclusively on theoretical nondiscriminatory approaches that Arizona could take to allow direct wine shipments.  To the extent the state is required to show that alternative nondiscriminatory approaches are not reasonably available, it meets that burden here.  If the premises requirement is discriminatory, the State demonstrates that no nondiscriminatory alternative is available to maintain its ability to inspect wholesalers, inspect retail premises and books, and ensure alcohol is funneled through a three-tier system.  Although Plaintiffs point to other states' approaches or alternatives such as "issu[ing] guidelines for responsible direct shipping" or creating "reciprocal enforcement agreements," these alternatives would not maintain Arizona's interests in inspecting its wholesalers and retailers and ensuring alcohol is funneled through Arizona's three-tier system.  (Doc. 48 at 21.)  Plaintiffs' proposed alternatives would ask the State to abandon its own ability to conduct inspections in favor of potentially creating a mutual agreement with another state to inspect or enforce violations.  This alternative is entirely speculative and largely impairs the State's legitimate interest in its own regulation and enforcement.

Plaintiffs' remaining two challenges to the State's asserted interests likewise fail. First, contrary to Plaintiffs' assertion, the Supreme Court has not rejected physical presence requirements nor found that they are not essential to a three-tiered scheme. In the case Plaintiffs cite for this proposition, *Granholm*, the question was whether New York could require out-of-state wineries to establish offices, warehouses, and distribution operations in the state prior to direct shipping, while exempting in-state wineries from such requirements. 544 U.S. at 474-75. Thus, the Supreme Court's discussion of the physical presence requirement was in the context of determining whether New York's scheme was discriminatory; there, it was discriminatory because in-state wineries did not need to comply with the same requirements imposed on out-of-state wineries. *Id.* In any event, *Granholm* does not stand for the broad-brush assertion that the Supreme Court has rejected physical presence requirements or found them to be nonessential in the three-tiered system. As *Granholm* states, "[s]tates may . . . funnel sales through the three-tier system. We have previously recognized that the three-tier system itself is 'unquestionably legitimate.'" 544 U.S. at 489.

And second, Plaintiffs' argument that Arizona has abandoned the three-tier system for wine specifically by allowing certain wineries to ship directly to consumers is incorrect. Creating an exception is not abandoning the entire system. *See, e.g.*, *B-21 Wines*, 36 F.4th at 226 ("[T]here is no single 'one size fits all' three-tier system that a state must either adhere to or abandon entirely."). Moreover, Defendants provide several reasons why the exception at the producer level should not expand to the retailer level. For example, wineries produce their own products and thus exercise quality control over the products. Wineries are also regulated by the federal government, and revocation of a license means it cannot operate in any state. Retailers, on the other hand, do not produce their own products and are regulated by individual states with varying degrees of regulations and oversight. These differences provide sufficient justification for the State's decision to exempt certain wineries from funneling alcohol through the three tiers but require that all retailers must operate within the three-tiered system.

Therefore, the premises requirement, and its consequent burdens and benefits to retailers who decide whether or not to obtain a license in Arizona, do not violate the dormant Commerce Clause.

## CONCLUSION

Accordingly,

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 38) is **DENIED**.

**IT IS THEREFORE ORDERED** that State Defendants' Motion for Summary Judgment (Doc. 43) is **GRANTED**.

**IT IS FURTHER ORDERED** that Intervenor-Defendant's Motion for Summary Judgment (Doc. 46) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 9th day of August, 2023.

G. Murray Snow
Chief United States District Judge